

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AFM:MS
F. #2024R00943

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 9, 2025

<u>By ECF</u>

The Honorable Taryn A. Merkl
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Iurii Gugnin
                <u>Criminal Docket No. 25-191 (NRM)</u>

Dear Judge Merkl:

       The government respectfully submits this letter in support of its application for a permanent order of detention for the defendant Iurii Gugnin. The defendant conceived and carried out a $500 million scheme to evade sanctions and export controls and launder funds on behalf of entities in Russia, including Russia's state atomic energy corporation. He was arrested today in Manhattan and will be arraigned before Your Honor on a 22-count indictment charging him with wire fraud, bank fraud, violations of the International Emergency Economic Powers Act ("IEEPA"), money laundering, and other offenses.

       The defendant is a Russian national who entered the United States only three years ago on a temporary visa and has no permanent ties to this country. He has access to significant wealth both here and abroad. He has contacts with government officials in Russia and Iran—countries that do not extradite to the United States—including with members of Russia's intelligence services. And his sweeping foreign ties include property he owns and rents overseas, foreign bank accounts and companies, family members in Russia, and frequent international travel, including to at least 34 different countries on 73 occasions.

       The defendant is also a practiced liar who made false statements to at least 10 different financial institutions, as well as to Florida state regulators. And he now has a powerful incentive to flee: he faces counts with statutory maximum sentences of up to 30 years' incarceration and an overwhelming body of inculpatory evidence, as detailed in the grand jury's 53-page speaking indictment. Simply put, this defendant has every reason to flee this jurisdiction and the connections and resources to do so. Because no set of conditions can mitigate his extreme risk of flight, he should be detained pending trial.

I.      Relevant Background[1]

    A.      The Charged Conduct

        On June 6, 2025, a grand jury sitting in this District returned a 22-count indictment against the defendant for wire and bank fraud, conspiracy to defraud the United States, violations of IEEPA, operating an unlicensed money transmitting business, failing to implement an effective anti-money laundering compliance program, failing to file suspicious activity reports, money laundering, and related conspiracy charges.  As detailed in the indictment, the defendant is the founder, president, treasurer, and compliance officer of Evita Investments, Inc. ("Evita Investments") and Evita Pay, Inc. ("Evita Pay") (collectively, "Evita"). Through Evita, the defendant regularly facilitated international payments for foreign customers that totaled in the hundreds of millions of dollars in a variety of fiat- and crypto-currencies.  In doing so, he enabled his customers, many of whom held funds at sanctioned Russian banks, to provide the defendant with cryptocurrency, which he then laundered through cryptocurrency wallets and U.S. bank accounts.  In the process, the funds were disassociated from their source, disguising the audit trail and hiding the true counterparties to the transactions.

        The indictment describes four separate unlawful schemes engaged in by the defendant.  The first is a bank fraud and wire fraud scheme in which the defendant lied to at least 10 different financial institutions about the nature of Evita's business.  This included repeatedly denying that Evita did business with customers in Russia, falsely representing that Evita followed rigorous compliance procedures and complied with financial sanctions, and offering false explanations for why Evita Investments had not registered as a money transmitting business.  The defendant also lied to Florida state regulators about the nature and expected volume of Evita Pay's business, in order to obtain a money transmitter license.  He then used that fraudulently obtained license to induce a U.S. cryptocurrency exchange to process transactions on his behalf.

        The second scheme is a scheme to evade financial sanctions.  The defendant willfully facilitated the movement of funds held at sanctioned Russian banks, including PJSC Sberbank, PJSC Sovcombank, PJSC VTB Bank, and JSC Tinkoff Bank.  He also transacted in his personal accounts at sanctioned Russian banks while residing in the United States, including JSC Alfa-Bank and PJSC Sberbank.  At least one of the payments from a sanctioned bank was to purchase parts on behalf of Russia's state-owned nuclear energy company, Rosatom.[2]

---

[1] The government may present evidence in favor of detention through proffer.  *See United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000) (finding district courts may properly rely on proffered evidence in detention and bail revocation hearings).  Further, evidentiary rules concerning admissibility "do not apply to the presentation and consideration of information at [a bail] hearing."  18 U.S.C. § 3142(f)(2)(B).

[2] While Rosatom itself is not sanctioned, nearly 70 Rosatom subsidiaries, employees, and/or board members are subject to U.S. sanctions.  *See* U.S. Department of State, *Sanctions to Degrade Russia's Energy Sector* (January 10, 2025), available at https://2021-

The third scheme is a scheme to evade export controls. The defendant facilitated payments on behalf of entities and individuals in Russia to purchase sensitive electronics designed by U.S. technology companies. One of these payments, for example, was for a computer server that was export-controlled for anti-terrorism reasons. The defendant intentionally altered an invoice for that transaction to hide the name and location of the Russian purchaser of the server.

The fourth scheme is a scheme to violate the Bank Secrecy Act. Although the defendant represented to banks and cryptocurrency exchanges that Evita followed rigorous anti-money laundering and know-your-customer requirements, in practice the defendant flouted those requirements, as well as the requirement to file reports of suspicious activities with the Financial Crimes Enforcement Network ("FinCEN").

To operate his illicit business, the defendant relied on encrypted communications and routinely took steps to cover his tracks. Evita's website specifically directed customers to contact him over the encrypted messaging platform Telegram, an application the defendant also used to chat with executives at cryptocurrency exchanges. The defendant's web search history shows that he sought to delete his chats, including, for example, searching for "how to clear telegram cache on mac," and "telegram webpage bot clear cache." He also visited a webpage titled "How to clear-delete telegram cache on iPhone, iPad, Android, Windows, or Mac." To conceal his activities, the defendant also obfuscated more than 80 invoices by digitally "whiting out" the names and addresses of his Russian customers.

The defendant's online activity demonstrated his knowledge of the sanctions and export controls he was evading, including by searching for "ofac sanctions"[3] and "reason for iran sanctions." He also visited a Department of Commerce website titled "Russia Export Controls – List of Common High Priority Items." Even more, the defendant's web activity showed his awareness generally that he was breaking the law, including by searching for "how to know if there is an investigation against you"; "evita investments inc. criminal records search"; "Iurii Gugnin criminal records"; "money laundering penalties US"; and "penalties for sanctions violations EU luxury goods." The defendant also visited website pages titled, respectively, "am I being investigated?"; "signs you may be under criminal investigation"; and "what are the best ways to find out if you're being investigated and what can someone do when they think they might be under investigation." Despite being aware of applicable laws and the significant potential penalties for violating them, the defendant continued his illicit business through the date of his arrest.

---

2025.state.gov/office-of-the-spokesperson/releases/2025/01/sanctions-to-degrade-russias-energy-sector/.

[3] "ofac" refers to the Office of Foreign Assets Control, an office within the U.S. Treasury Department that administers financial sanctions programs.

B.    The Defendant

The defendant is a Russian national who entered the United States in June 2022. He was granted an O-1A visa, a type of temporary status afforded to individuals who purportedly possess extraordinary abilities, and that lasts for a period of three years, absent extension. He currently has a pending application for lawful permanent resident status, but that application has not been approved.

The defendant holds himself out as an entrepreneur and thought leader in "Fintech" or financial technology, particularly cross-border payments. In practice, the defendant is an expert at moving money around the world while hiding its source and the purpose of the transfers.

The defendant's customers are primarily located in Russia—a fact that, as noted, he lied about repeatedly to various financial institutions. In addition to Russia, the defendant's business also involved China, South Korea, India, Türkiye, Hong Kong, Singapore, the United Arab Emirates ("UAE"), and other countries. As part of operating Evita, the defendant maintained a virtual private server, through which clients would contact the defendant to submit requests for cross-border payments. The defendant's virtual private server routinely communicated with internet protocol ("IP") addresses hosted by internet service providers in Russia, Iran, China, and Belarus—none of which countries extradites to the United States.

The defendant has connections with government officials in Russia and Iran who could help facilitate his flight from prosecution, including members of Russia's intelligence services. Specifically, the defendant's Apple iCloud account contains saved contacts for multiple officials from Russia's Federal Security Service ("FSB"), the main successor agency to the Soviet Union's KGB; an assistant to a member of the Russian State Duma, Russia's lower house of parliament; an advisor to a high-level official at Rostec, a Russian state-owned defense conglomerate subject to U.S. sanctions; an individual with an Iranian phone number saved as "[name] Iran gov"; and another individual with an Iranian phone number saved under "Iran Crypto Grain." The defendant's iCloud account also contains a series of saved notes describing a proposed scheme to launder funds on behalf of a particular FSB official through China, "with the possibility of hiding data on trade transactions from the United States"; as well as a business proposal that involved integrating "Russian bank's servers with Iranian ones."

In addition to extensive contacts in Russia, Iran, and other countries, the defendant's operation of Evita has provided him with access to substantial wealth. In less than two years, the defendant laundered approximately $530 million through bank accounts and cryptocurrency wallets under his control. He resides in a luxury apartment in Manhattan, for which he currently pays approximately $19,000 per month in rent.[4]

---

[4] The defendant's residence in a luxury Manhattan apartment was the subject of a Wall Street Journal report. *See* Wall Street Journal, *These Millionaires Can Afford Their Dream Home. They're Renting Instead* (September 16, 2024), *available at* https://www.wsj.com/economy/housing/these-millionaires-can-afford-their-dream-home-theyre-renting-instead-2cc86a73?gaa_at=eafs&gaa_n=ASWzDAjyYzYdWnDtz1wGEl-

The defendant also controls numerous foreign financial accounts and corporate entities, all of which could assist him in fleeing overseas. He has at least six accounts held at sanctioned Russian bank JSC Alfa-Bank, including both ruble- and dollar-denominated accounts. He has at least one account held at sanctioned Russian bank PJSC Sberbank. He controls bank accounts in the name of Evita Investments in Germany, France, and Ireland. And he owns at least 50% of several international affiliates of Evita Investments, including entities incorporated in Nigeria, India, and the United Kingdom.

When the defendant applied for his O-1A visa in 2022, he indicated that his main residence was in Moscow, Russia, and that he also maintained a "country-side" residence in Novoselovo, Russia. He also rents a property in the United Kingdom and purchased a separate property for three million Euros in Cyprus. And while the defendant's spouse and two children moved with him to New York in the last three years, he has no other known family in the United States and his mother still resides in Russia.

As part of his visa application, the defendant stated that, between 2010 and 2022, he had traveled abroad to 34 different countries on 73 occasions. He possesses a Russian passport and a resident identity card in the United Arab Emirates ("UAE"), and has obtained visas to travel to China, Nigeria, Japan, the United Kingdom, Italy, France, and other countries. The defendant's web search history indicates that his interest in international travel continued after arriving in the United States. In 2023 and 2024, he conducted web searches for the following search terms, among others: "can I travel.to Mexico without passport only green card," british passport," "buy granada passport," and "israeli passport no visa us."

The defendant set up a global money laundering and sanctions evasion operation and showed ingenuity in covering his tracks. Now that he has been charged in connection with that operation, it is overwhelmingly likely that, if released, he will use his overseas assets and connections to flee the jurisdiction.

II.    Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141, *et seq*., federal courts must order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. *See* 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. *See United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987).

In addition, the Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the

---

v7sPpEcMP8dCUIKaKmxakw73gY13NMwk1uz79nhHdOdY%3D&gaa_ts=684472e1&gaa_sig=1S9gglsZivPPugddyeIO_Vx_nbniPgzBSOYVPxjXLxRh-PX8dGgqTG9FGVgXYuLuPj3ohIhfvxERJESg3h_7Hw%3D%3D.

evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *See* 18 U.S.C. § 3142(g).

The Bail Reform Act also provides that where a defendant "is not a citizen of the United States or lawfully admitted for permanent residence," and "such person may flee," the judicial officer before whom the defendant makes his initial appearance "shall order the detention of such person, for a period of not more than ten days, excluding Saturdays, Sundays, and holidays, and direct the attorney for the Government to notify . . . the appropriate official of the Immigration and Naturalization Service. If the official fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section."  18 U.S.C. § 3142(d).

III.    The Defendant Should be Detained Pending Trial

The statutory factors under the Bail Reform Act counsel heavily in favor of detention.  The government has more than met its burden to show by a preponderance of the evidence that, if released, the defendant poses an irremediable risk of flight.

*First*, there can be no serious dispute that Gugnin has the resources, means, and connections to flee prosecution.  The defendant's worldwide money laundering operation has granted him access to substantial wealth.  He has robust overseas connections, including to the Russian intelligence apparatus and Iranian government.  He maintains bank accounts and companies overseas.  And he is experienced in surreptitiously moving money around the world and altering and deleting records to conceal his activities.  The defendant could take advantage of all of this to help facilitate his escape from justice.

This is not merely a hypothetical concern.  In a recent case charged in the Eastern District of New York, Artem Uss, a Russian procurement agent alleged to have violated U.S. export laws, was arrested in Italy and—over the United States's objections—released to home detention pending his extradition to this District.[5]  Uss then fled prosecution with the assistance of a Serbian organized crime group which smuggled him out of Italy and across several international borders before finally boarding a flight to Russia.  Today, Uss remains an international fugitive.[6]

_____

[5] *See United States v. Orekhov et al.*, No. 22-CR-434 (E.D.N.Y.); Press Release, Five Russian Nationals and Two Oil Traders Charged in Global Sanctions Evasion and Money Laundering Scheme, *available at* https://www.justice.gov/usao-edny/pr/five-russian-nationals-and-two-oil-traders-charged-global-sanctions-evasion-and-money (last visited Jan. 22, 2024).

[6] *See United States v. Jovancic*, No. 23-CR-430 (E.D.N.Y.) (criminal case against individuals who aided in the escape of Uss); Press Release, Bosnia and Herzegovina National Arrested for Aiding Escape of Russian Defendant, *available at* https://www.justice.gov/opa/pr/bosnia-and-herzegovina-national-arrested-aiding-escape-russian-defendant (last visited Jan. 22, 2024).

*Second*, Gugnin has extensive ties abroad and no permanent ties to this country. He has been in the United States for only three years, on a temporary visa.  He has family, citizenship, real estate, and bank accounts in Russia.  Before coming to the United States, the defendant engaged in constant international travel.  And he has expressed an interest in obtaining citizenship in additional foreign countries, including Grenada, the United Kingdom, and Israel. Even with his passports confiscated, the defendant could easily obtain a new passport from the Russian embassy or consulate or through his international connections, then cross the border and flee to Russia.  And although his wife and two children live with him in the United States, they could simply depart the country and join the defendant once he is safely beyond the reach of U.S. law enforcement.  *See United States v. Baig*, 536 F. App'x 91, 93 (2d Cir. 2013) (affirming detention order in part because the defendant "though a permanent resident of the United States, is a citizen of Pakistan and maintains ties there"); *United States v. Bonilla*, 338 F. App'x 78, 80 (2d Cir. 2010) (finding detention appropriate even though the defendant "had close family in New York and had surrendered his passport" because "he posed a flight risk because he had relatives in the Dominican Republic and had made frequent trips there in recent years").

*Third*, the defendant has shown no hesitation about lying and cheating to get what he wants.  This is not a defendant who regrettably lied on a few occasions.  The defendant habitually lied and falsified records in service of a globe-spanning, half-billion-dollar money laundering and sanctions evasion scheme.  Over and over again—to essentially every financial institution he dealt with—the defendant told blatant lies about the nature of Evita's business, including whether he conducted business with Russian clients and complied with sanctions. Given this record, any assurance the defendant offers about his intent to appear in court simply cannot be trusted.  *See United States v. Boustani*, 932 F.3d 79, 83 (2d Cir. 2019) (upholding detention of fraud defendant as flight risk due to the strength of the government's evidence and the defendant's "alleged deceptive actions, access to substantial financial resources, frequent international travel, complete lack of ties to the United States, and extensive ties to foreign countries without extradition"); *United States v. Nouri*, No. 07-CR-1029, 2009 WL 2924334, at *2 (S.D.N.Y. Sept. 8, 2009) (Chin, D.J.) (finding defendant presented "substantial risk of flight" based, in part, on "dishonest and obstructive conduct," including "commit[ting] fraud on his investors").

*Fourth*, the defendant has every incentive to flee.  He faces a statutory maximum sentence of 30 years in prison on the bank fraud charges alone, and, if convicted on all counts, a consecutive maximum sentence significantly longer than his lifetime.  Given the more than $500 million laundered through his scheme, the defendant's leadership role, his use of sophisticated means, the numerous charged counts, and the impact on national security, it is fair to anticipate that he will receive a substantial sentence if convicted.  *See United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence.").  The evidence against Gugnin is overwhelming, including business and financial records, detailed ledgers, email communications with co-conspirators, falsified invoices, and online searches demonstrating his state of mind. *See United States v. Rounds*, 2015 WL 6604007, at *1 (2d Cir. Oct. 30, 2015) (finding that the

"gravity of the charges and the strength of the evidence on which [the defendant's] detention was based . . . counsel[s] against release").

        *Finally*, in light of this record, there is no set of conditions that could assure the defendant's appearance in Court.  Any significant bond package would create little incentive for the defendant to appear given his access to significant wealth—much of which appears to be overseas and/or stored in cryptocurrency.  Nor would any surety or third-party custodian mitigate his risk of flight.  The defendant could easily reimburse any surety for losses arising from his nonappearance.  At the same time, the defendant could likely conceal any plans to abscond from any third-party custodian—just as he concealed the existence of his Russian clients from virtually every legitimate business partner of Evita.  Any home detention and/or electronic monitoring in lieu of detention would not mitigate the risk of flight either, and instead "at best elaborately replicate a detention facility without the confidence of security such a facility instills."  *United States v. Millan*, 4 F.3d 1039, 1049 (2d Cir. 1993) (citations omitted); *see also United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) ("[E]lectronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology.") (citations omitted).  This comports with the Second Circuit's recent holding that the Bail Reform Act does not permit a two-tiered bail system where wealthy defendants are effectively released to self-funded private jails.  *See United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019).  Indeed, the Court in *Boustani* affirmed detention based on flight risk alone for a defendant facing non-violent, white-collar charges who demonstrated the incentive and means to flee, as well as ties to foreign countries without extradition.  *Id.* at 82-83.  The same holds here, where electronic monitoring and home detention would not cure the overwhelming risk of flight posed by this defendant.[7]

---

       [7] Recent history in this district bears this out, with numerous defendants fleeing or otherwise attempting to thwart electronic monitoring after being released pretrial.  *See United States v. Dali*, 24-MJ-645 (JAM) (defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); *United States v. Horst Jicha*, 23-CR-342 (OEM) (defendant charged with securities fraud and associated crimes cut his location monitoring device while on pretrial release and absconded days before he was supposed to appear for a status conference and remains at large); *United States v. Tony Clanton*, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); *United States v. Georges Barker*, 23-MJ-27 (SIL) (defendant in an extradition proceeding tampered with his location monitoring bracelet on two occasions before he was remanded); *United States v. William Bartell*, 22-CR-80 (EK) (defendant charged with multiple bank robberies cut his location monitoring device and absconded within one week of being released on bail due to medical issues); *United States v. Joey Macario*, 22-CR-342 (HG) (defendant charged with fraud absconded after removing his location monitoring device and discarding it on the subway tracks moments after being released to attend drug treatment); *United States v. Dewayne Tripp*, 22-CR-336 (MKB) (defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); *United States v. Marius Lacatis*, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device, fled, and remains at large); *United States v. Marcus Deloatch*, 21-CR-457 (ENV) (defendant charged with Hobbs Act robbery cut

In short, the facts of this case cry out for detention. The defendant poses an immediate and extreme risk of flight that no set of conditions can mitigate.

---

his location monitoring device and fled in advance of a bail revocation hearing); *United States v. Herman Baron*, 21-CR-307 (NGG) (defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled the jurisdiction approximately one hour before his scheduled change-of-plea hearing; arrested five months later in the Northern District of Georgia); *United States v. Michael Artis*, 20-CR-409 (PKC) (defendant released following a violation of supervised release cut his location monitoring device and failed to appear at bail revocation hearing); *United States v. Charles May*, 19-CR-539 (FB) (defendant charged with armed robbery absconded while on home detention and remains at large); *United States v. Theressa Riddle*, 17-CR-491 (JS) (defendant released on bond cut her location monitoring device and did not appear for bond violation hearing); *United States v. Sinmyah Amera Ceasar*, 17-CR-048, 19-CR-117, 22-CR-459 (KAM) (defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and the government discovered evidence of her violating release conditions); *United States v. Guanghua Shen*, 18-CR-302 (MKB) (defendant cut her electronic monitoring device at JFK Airport the day before she was required to self-surrender to the Bureau of Prisons); *United States v. Akmal Narzikulov*, 13-CR-601 (RJD) (defendant cut his electronic bracelet days after being released on bail); *United States v. Julian Tzolov*, 08-CR-370 (JBW) (defendant in fraud scheme attempted to flee to Spain while on location monitoring).

VI.    <u>Conclusion</u>

For all of these reasons, the government respectfully requests that the defendant be detained pending trial.[8]

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    <u>/s/ Matthew Skurnik</u>
Matthew Skurnik
Assistant U.S. Attorney
(718) 254-6231

cc:    Clerk of Court (by ECF)
Defense Counsel (by ECF)

---

[8] If the Court is not inclined to enter a permanent order of detention, the defendant should be temporarily detained for up to ten days pursuant to 18 U.S.C. § 3142(d) to allow the United States Citizenship and Immigration Services the opportunity to consider the defendant's immigration status and whether he should be taken into administrative custody.